IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


JACQUELYN R. CRAWFORD,              :
                                    :
            Plaintiff,              :
                                    :
      v.                            :     CIVIL ACTION NO.
                                    :     1:04-CV-0089-JOF
BARBARA CARROLL, et al.,            :
                                    :
            Defendants.             :


## OPINION AND ORDER

This matter is before the court on Defendants' motion for summary judgment [43-1];

the Report and Recommendation of Magistrate Judge Joel M. Feldman [64-1]; Defendant's

objections thereto [69-1]; and Plaintiff's objections thereto [70-1].

I.     **Background**

       A.     **Procedural History and Facts**

       Plaintiff, Jacquelyn Crawford, an African-American female, filed suit against

Defendants, The Board of Regents of the University System of Georgia; Barbara Carroll, in

her individual and official capacities; and Kathryn Johnston, in her individual and official

capacities, alleging that Defendants discriminated against her on the basis of her race and

retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e *et seq.*; 42 U.S.C. § 1981; and the Equal Protection Clause of the Fourteenth

Amendment pursuant to 42 U.S.C. § 1983.  In a Report and Recommendation dated August 24, 2006, Magistrate Judge Joel M. Feldman, recommended granting in part and denying in part Defendants' motion for summary judgment.   Both Plaintiff and Defendants filed objections to the Report and Recommendation and then replied to each other's objections.

Plaintiff began working for Georgia State University in 1992 as the Wage and Salary Administrator for Georgia State's Human Resources office.   In December 1997, Plaintiff was promoted to the position of Manager, Classification and Compensation.   Until her retirement, Defendant Katherine Johnston was Georgia State's Vice President of Finance and Administration.   The Vice President of Finance and Administration supervises approximately 800 positions at Georgia State University, including budget, human resources, physical plant, facilities planning, campus master planning, and campus police.   Defendant Barbara Carroll was Assistant Vice President of Human Resources from March 1999 until August 2004 when she took a position at North Carolina State University.   Johnston was Carroll's supervisor. In turn, Carroll supervised the following positions:   Director of Human Resources (Scott Foust); Director of Human Resources for Information Systems (Melissa Brennaman); Director of Payroll (Dawn Davis); and Plaintiff.

In March 2000, Carroll reprimanded Plaintiff for misuse of bereavement leave. Plaintiff filed a grievance contending that Carroll discriminated against her on the basis of her race because Carroll did not understand the burial rites of blacks which require more than three days of leave.  Dr. Ron Henry, Georgia State's Provost and Vice President for Academic

2

Affairs, reversed the reprimand and instructed that it be removed from Plaintiff's personnel file.

Carroll first discussed creating a new position of Director, Classification and Employment, at a staff meeting in the Spring of 2000. Because other individuals in the Human Resources office had received "in-place" promotions (promotions that resulted from an employee's position being reclassified in job title and salary without the position having been posted for competitive recruitment), Plaintiff believed she would be eligible for an "in-place" promotion to the position of Director, Classification and Employment. The position, however, was posted in August 2001, at which point Plaintiff understood there would be no "in-place" promotion. Plaintiff applied for the position and was selected for an interview. In December 2001, Plaintiff complained to Georgia State's Office of Affirmative Action and Diversity Programs about the recruitment process being used to fill the new position.

On January 18, 2002, Carroll told Plaintiff that she (Plaintiff) was not selected to fill the position and that, in fact, no candidate had been selected because there was no agreement among the decisionmakers. The selection panel included: Carroll, Melissa Brennaman, Dawn Davis, Sonya Richburg (black), and Paula Gomes (black). The panel recommended that Nancy Strasner, a white female, be selected for the position. Linda Nelson, Director of Georgia State's Affirmative Action Office, however, believed that although Strasner and Plaintiff were "somewhat equal," Plaintiff was "best suited" for the position. Mae Okwandu, an Equal Opportunity Specialist at Georgia State, also believed that Plaintiff had better qualifications

3

than Strasner.  Ms. Nelson told Carroll and Johnston of her concerns.  Based on Ms. Nelson's problems with the process, Johnston decided that she would not approve Strasner's selection to the new position and the job was left open.  Carroll temporarily assigned some of the duties of the new position to Melissa Brennaman, the Director of Human Resources for Information Systems.  Brennaman had worked for Georgia State for more than twenty years and her salary was $70,000 per year.

The position was re-posted in January or February 2002.  Plaintiff applied but no candidates were selected for an interview.

In April 2002, Carroll gave Plaintiff a negative performance evaluation which caused Plaintiff not to receive a merit pay increase in October 2002.  On May 13, 2002, Plaintiff filed a grievance with Johnston concerning (1) the negative performance review, (2) the resulting denial of a merit increase, and (3) the fact that Plaintiff was not selected for the new position.  Johnston met with Plaintiff on July 18, 2002, for forty-five minutes to discuss the situation and later denied Plaintiff's grievance.  Plaintiff felt that Johnston did not take her concerns seriously and was "retaliatory" in the meeting.

Plaintiff appealed her grievance to Carl Patton, the President of Georgia State University.  Plaintiff also filed a complaint with Georgia State's Affirmative Action Office concerning her non-selection for the new Director position, and her negative performance evaluation and resulting denial of a merit increase.  That office hired an independent investigator, Arthur Rogers, to review Plaintiff's complaint.  He issued a final report on

4

October 10, 2002. Mr. Rogers concluded that "it is recommended that a cause determination be issued in regards to race, and retaliation as they pertain to evaluation, merit pay, promotion opportunity and disparate treatment." Mr. Rogers testified that he interviewed at least three other African-American employees in the department who believed that Carroll had discriminated against them. Mr. Rogers also believed that white employees were being "moved forward" at a faster pace than black employees. Ms. Nelson agreed with Mr. Rogers' findings.

On October 28, 2002, President Patton directed that a "desk audit" of Plaintiff's position, salary, and responsibilities be performed. Johnston requested that an outside consultant be hired to perform the desk audit. Georgia State hired a consultant, Whit Perrin Wright, to do a functional assessment of the entire Office of Human Resources. Ms. Wright completed her audit in March 2003. She reported that most universities do not combine the functions of employment and classification. (The parties quibble about whether Ms. Wright "recommended" that the position of Director, Classification and Employment, be abolished. She did not use this word *per se*, but her report indicates that such a position is unusual and that the functions could be combined with other HR functions.)

Ms. Wright also noted concerns that Ms. Brennaman's position did not involve as much responsibility as other managers' positions. Although she was designated as a director, Ms. Wright noted that her post did not seem to have any greater depth or scope than a manager position. Ms. Brennaman also did not have direct reports. Ms. Wright recommended that the

5

Human Resources Department have a clearer definition of the criteria used to determine titles, pay bands, and pay grades.  She further noted that Plaintiff's position seemed to be paid below the benchmark for manager-level jobs, while Ms. Brennaman's position was paid at the median or average salaries.   Ms. Wright stated that she believed Plaintiff was being paid approximately $4,000 less than the market rate.

In the meantime, the position of Director, Classification and Employment, had been posted for a third time in October 2002.   A "screening panel" reviewed the initial group of applicant resumes.   The panel was comprised of major customers and individuals that would interact with the new position.   Plaintiff was not selected to be interviewed during this posting. Two candidates were eventually interviewed for the position.   The panel recommended that a white male candidate, Russell Willis, receive the position, but Linda Nelson recommended to Johnston that the position not be filled while Plaintiff's race discrimination claims were pending with the Affirmative Action Office.   Once Ms. Wright issued her findings, Johnston testified that Carroll decided to abolish the position based on Ms. Wright's report.

Johnston ceased supervising the Office of Human Resources in March 2003. Johnston's duties were shifted to Jerry Rackliffe who was ultimately named Vice President for Finance and Administration.   On October 21, 2003, Mr. Rackliffe wrote to Plaintiff and informed her that as a result of the review of positions by Ms. Wright, her position had been reclassified from a pay grade 17 to a pay grade 18.   Her salary was adjusted upward to $54,740.   Mr. Rackliffe also informed Plaintiff that as a result of her grievance concerning

6

the 2001-2002 performance evaluation, Plaintiff's salary had been adjusted upward by four percent, making her base salary $56,930. This adjustment was made retroactive to October 1, 2002. *See* Plaintiff's Depo., Exh. 10.

In August 2004, Rackliffe promoted Plaintiff to Assistant Director of Human Resources and increased her salary to $70,000 per year.

**B.     Contentions**

Plaintiff contends that Defendants discriminated and retaliated against her in (1) failing to give her a merit increase in 2002, (2) treating her disparately in the terms and conditions of her job by paying her under the benchmark rate for her position, denying her sufficient staff to perform her job functions, and placing too many demands on her job function, and (3) failing to promote her to the position of Director, Classifications and Employment.

Defendants contend that Plaintiff cannot make out a prima facie case of discrimination or retaliation because she suffered no adverse employment action. Defendants argue that because Plaintiff's salary was increased retroactively, she did not suffer any tangible injury. Defendants further aver that no candidate was ever selected for the Director, Classifications and Employment position, and therefore, Plaintiff was not discriminated against in not receiving the position. Defendants also contend that Johnston cannot be individually liable under section 1983 because she took no direct action against Carroll, and none of her involvement in the situation is causally connected to Plaintiff's alleged constitutional deprivations.

7

## II.     Discussion

### A.     Claims and Limitations Period

The court will first ascertain Plaintiff's exact claims of discrimination and then determine which of those claims is outside the statute of limitations period under either Title VII or section 1983.   After the court isolates the remaining timely claims in Plaintiff's complaint, the court will then address their merits.

During the briefing on Defendants' motion for summary judgment, Plaintiff abandoned numerous claims.   All parties agree that Plaintiff's only remaining claims are: (1) Title VII race discrimination and retaliation against Defendant Board of Regents, and (2) race discrimination in violation of the Equal Protection Clause via 42 U.S.C. § 1983 against Plaintiff's supervisors, Barbara Carroll and Katherine Johnston, in their individual capacities.

Plaintiff's initial Charge of Discrimination filed with the EEOC on December 23, 2002, asserts that she was discriminated against on the basis of her race because she was denied a merit increase for October 2002.   She also asserts that on "October 1, 2002, I was made aware that I am paid less than a similarly situated White female, who has less responsibility and no staff to manage."   *See* Plaintiff's Depo., Exh. 7.   The court agrees with Plaintiff that this charge of discrimination would cover (1) Plaintiff's 2001-2002 performance evaluation and subsequent denial of a merit increase, (2) the lack of opportunity for "in-place" promotions for blacks, and (3) discrepancies in pay.   Notably, however, Plaintiff's assertion that she was denied an "in-place" promotion to the position of Director,

8

Classification and Employment, in 2001, is time barred under this charge of discrimination. Plaintiff, herself, admitted that she knew as of August 2001 that she had not received an "in-place" promotion for this position because the job was posted. *See* Crawford Depo., at 106. The court further notes that the "lack of opportunity" for "in-place" promotions for blacks is not an actionable assertion on its own.   Plaintiff has not identified any other "in-place" promotions which she believed she should have received, and therefore the court does not further consider any "in-place" promotion assertions raised by Plaintiff.

Plaintiff filed an amended charge of discrimination on April 18, 2003, asserting discrimination on the basis of race and retaliation.   Once again, the court agrees with Plaintiff's assertion that this charge would cover her failure to receive the promotion to Director, Classification and Employment, which was posted in October 2002.   Notably, Plaintiff's claim that she did not receive the promotion posted in August 2001 is time-barred under this amended charge of discrimination.

All parties agree that the statute of limitations governing Plaintiff's section 1983 equal protection claim is two years.   Plaintiff filed her complaint on January 14, 2004.   Thus, any action prior to January 14, 2002, is time barred.   This includes the "in-place" promotion to Director, Classification and Employment, that would have happened in August 2001.   Plaintiff was informed on January 18, 2002, that she did not receive the promotion to Director, Classification and Employment, that had been posted in August 2001.   Thus, this claim – and

9

the third posting of the position – fall within the statute of limitations for section 1983 purposes.

Thus, the court concludes that Plaintiff's timely disparate treatment claims are: (1) denial of a merit increase in October 2002, (2) discrepancy in pay and responsibilities between Plaintiff and Melissa Brennaman, and (3) denial of promotion to Director, Classification and Employment (save the "in-place" aspect).  The court notes that Plaintiff also relies on these three incidents to support her retaliation claim.  Therefore, the merits discussion addresses both.  The court notes, however, that Plaintiff's retaliation claim proceeds only under Title VII and not section 1983.  *See Ratliff v. DeKalb County*, 62 F.3d 338, 340 (11th Cir. 1995) (the "right to be free from retaliation is clearly established as a first amendment right and as a statutory right under Title VII; but no clearly established right exists under the equal protection clause to be free from retaliation"); *see also Gardner v. City of Camilla*, 186 Fed. Appx. 860 (11th Cir. 2006) (same).[1]

**B.    Merits**

    1.    Denial of Merit Increase

---

[1]On the periphery, Plaintiff contends that Defendant Carroll discriminated against her when she asked Plaintiff to open e-mails within twenty-four hours, forwarded complaints from other departments to Plaintiff, asked Plaintiff more questions than she used to, and used an unpleasant "tone" in her e-mails to Plaintiff.  Plaintiff, herself, does not assert that these actions rise to the level of substantiality required to constitute adverse employment actions, and the court will not address them further.

Plaintiff contends that Carroll discriminated and retaliated against her by giving her a negative performance evaluation which rendered her ineligible for a merit increase in 2002. For the purposes of clarity, the court must emphasize (because Plaintiff repeatedly conflates the issues) that Plaintiff's claim that she was denied her merit increase is separate from her claim – addressed below – that she was paid less than her comparators.  Thus, her argument that she received less in salary than Brennaman is irrelevant to her merit increase claim. Likewise, the court notes that Plaintiff's claim that she received disparate pay than Brennaman is separate from her contention that she should have been promoted to a Director position and been paid in the $70,000 range, as was Brennaman, a Director.  After all, Plaintiff cannot contend she is entitled to the salary at the promotion level until she can demonstrate that she was entitled to a promotion.  The court addresses separately Plaintiff's contention that she was discriminated against in her failure to receive a promotion.

To establish a prima facie case of disparate treatment based on race discrimination, a plaintiff must show (1) she is a member of a protected class, (2) she was qualified for the job, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated employees who are not members of the protected class more favorably.  *See*, *e.g.*, *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000).

To establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in statutorily protected activity; (2) she received an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *See Wideman v. Wal-*

11

*Mart Stores*, 141 F.3d 1453, 1454 (11th Cir. 1998).   Plaintiff contends that her protected speech was her protest of Carroll's "culturally biased" application of Georgia State's bereavement policy, followed by her complaints of discrimination made with various officials at Georgia State University.

With respect to both the race discrimination and retaliation claims, the parties focus on whether Plaintiff suffered an adverse employment action.   The court notes that the Supreme Court has recently held that the standard for what constitutes an adverse employment action in discrimination and retaliation cases is different with retaliation cases requiring a showing of "material adversity."   *See Burlington Northern & Sante Fe Ry. v. White*, 126 S. Ct. 2405 (2006).

There is no dispute that as a result of the rating Carroll gave to Plaintiff on her 2001-2002 evaluation, Plaintiff did not receive an increase in her salary effective October 2002. It is also true that in *Gillis v. Georgia Department of Corrections*, 400 F.3d 883 (11th Cir. 2005), the Eleventh Circuit held that an evaluation that "directly disentitled an employee to a raise of any significance is an adverse employment action under Title VII."   *Id.* at 888.   But that does not end the matter here.   Plaintiff exercised her rights to a grievance through the Georgia State University system and ultimately prevailed on this complaint.   She was notified on March 12, 2003, that her salary would be retroactively increased four percent from May 6, 2002.   The question then becomes whether Plaintiff has suffered an adverse employment action because of the time period between May 6, 2002, and March 12, 2003, when she did

12

not have her increase in salary.    Defendant argues that the Eleventh Circuit held in *Stavropolous   v.   Firestone*, 361 F.3d 610 (11th Cir. 2004)*, that when an employee retroactively receives the benefits to which she claims she is entitled, there is no adverse employment action.    Plaintiff argues that the Supreme Court's recent decision *Burlington Northern*, effectively overrules *Stavropolous*.

In *Stavropoulos*, the plaintiff, an assistant professor, filed suit against the Board of Regents of the University System of Georgia and various officials, contending that she was retaliated against in violation of Title VII and the First Amendment.    The plaintiff had been part of a faculty panel formed to select a new faculty member.    She and another member of the panel did not favor the candidate eventually selected by the panel.    Rather, they favored a female candidate.    After the male candidate was selected, the plaintiff assisted the female candidate in complaining to the University's legal department that she had been a victim of discrimination.    Later that year, the faculty of Plaintiff's academic department voted not to renew her one-year teaching contract.    However, the Dean of the department overturned that recommendation, and Plaintiff's contract was renewed for the following year.    A similar situation occurred the next year.

The Eleventh Circuit noted that in order to be an adverse employment action for the purpose of Title VII, an action "must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'"    *Id.* at 616-17.    "Ultimate employment decisions include decisions such as termination, failure to hire, or demotion."    *Id.* at 617.    The

13

court ruled that the conduct the plaintiff complained of was not an ultimate employment action because "she did not lose her job or suffer a lessening of pay, position, or benefits." *Id.* The court then considered whether the acts reached a level of substantiality and concluded that

> [h]ere, the acts [plaintiff] complains of ultimately had no effect on her employment status. Though agents of the Board rated her negatively and voted to terminate her, other agents of the Board overrode the votes, keeping [plaintiff] in her position, with the same pay and benefits. Thus, these acts were not objectively serious and tangible enough to be adverse employment actions.

*Id.* "Any emotional distress or costs incidental to [plaintiff's] seeking the review provided in her contract with the Board is likewise too insubstantial to be considered an adverse employment action since the review proved successful for [plaintiff]." *Id.* at 618. Because the plaintiff could not make out an adverse employment action, the court ruled she had not set forth a prima facie case of discrimination.

In *Burlington Northern*, the plaintiff worked as a track maintenance laborer for a brief time and was then assigned to the position of forklift operator. Shortly thereafter, the plaintiff complained that her foreman sexually harassed and discriminated against her. The company investigated the complaint and suspended the foreman, but then also removed the plaintiff from her position as a forklift operator and returned her to the position of track maintenance laborer. Several months later, the plaintiff was suspended without pay for insubordination. The plaintiff filed a grievance about the suspension and was reinstated after thirty-seven days and awarded back pay.

14

The Supreme Court first determined that "Title VII's substantive provision and its anti-retaliation provision are not coterminous.   The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."   Therefore, it is not limited to "ultimate employment decisions."   *Id.* at 2414.   More relevant to the facts here, the Court then went on to consider whether the plaintiff had suffered any retaliation that produced an injury.   The Supreme Court set forth the standard as:

> In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.   We speak of material adversity because we believe it important to separate significant from trivial harms.   Title VII, we have said, does not set forth a general civility code for the American workplace.   An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

*Id.* at 2415 (quotations and citations omitted).   The Court also found that the "provision's standard for judging harm must be objective."   *Id.*   Applying the standard to the facts before it, the Court concluded that there was sufficient evidence to support the jury's verdict that the plaintiff's reassignment and thirty-seven-day suspension without pay were acts of retaliation. "Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."   *Id.* at 2416.   Finding that Congress amended Title VII in 1991 to allow compensatory and punitive damages, the Court noted also that the plaintiff

15

and her family had to live for 37 days without income.  They did not know during that time whether or when White could return to work.  Many reasonable employees would find a month without a paycheck to be a serious hardship. And White described to the jury the physical and emotional hardship that 37 days of having "no income, no money" in fact caused.

*Id.* at 2417.  "That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay." *Id.*

Interestingly, the standard set forth by the Supreme Court in *Burlington Northern* is not in direct conflict with the standard used by the Eleventh Circuit in both discrimination and retaliation claims.  *See*, *e.g.*, *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001) (to establish adverse employment action, plaintiff must show "serious and material" change in terms, conditions, or privileges of employment).  However, the application of that standard appears to differ between *Stavropolous* and *Burlington Northern*.  In *Stavropolous*, the court determined that because the plaintiff had successfully utilized the grievance system in her work place, the fact that the initial layer of review had voted not to renew her contract was not seen as a materially adverse event.  While in *Burlington Northern*, the Supreme Court found a material event even though the plaintiff's pay was reinstated retroactively because the plaintiff had to suffer uncertainty and lack of pay for thirty-seven days.

The court need not determine the extent to which *Burlington Northern* might overrule *Stavropolous* because the factual circumstances of the two cases differ substantially and the cases, therefore, are distinguishable.  In *Burlington Northern*, the plaintiff did not know whether she had a job at all and was without pay completely for 37 days.  In *Stavropolous*, the

16

plaintiff never lost her teaching contract.  While she had to wait out a second level of review of the original decision not to renew her contract, she never lost her job or her pay.  Here, while Plaintiff did not immediately receive her merit increase due to the performance evaluation, her challenge to this evaluation ultimately was successful, and she received her merit increase.  Plaintiff's job was never in doubt, and she never lost any of her base salary.  As such, the court finds that Plaintiff's circumstances more closely match those of the plaintiff in *Stavropolous*, and she did not suffer a materially adverse action in having to await the results of her appeal before retroactively receiving her merit increase.  Therefore, the court GRANTS Defendants' motion for summary judgment on Plaintiff's denial of merit increase claim.

2.     <u>Disparate Treatment in Terms and Conditions of Employment</u>[2]

Plaintiff asserts that she was treated disparately with respect to Brennaman.  She contends that although Brennaman was classified at a higher position – director – she did not have as much job responsibility as Plaintiff did, Brennaman did not supervise any employees, and Brennaman was paid more than Plaintiff.  The straight salary comparison aspect of Plaintiff's claim is problematic.  There is no dispute that Brennaman had a longer tenure of service at Georgia State University.  Plaintiff's simple comparison of salary does not attempt

---

[2]Plaintiff asserts that it was discriminatory to permit Brennaman on a temporary basis to use the title "Director, Employment" when Plaintiff was not permitted to use the title "Director, Classification."  The court finds that this incident does not rise to the level of an adverse employment action even when considered with Plaintiff's other allegations.

to account for this significant difference, and this alone defeats Plaintiff's claim that Brennaman is a proper comparator. However, Plaintiff also proffers a more nuanced pay claim. She contends that she was not paid at the proper level even for her manager position while other employees in the Human Resources Department – including Brennaman – were paid at the high range of their position.

The court finds that Plaintiff's allegation that she was not paid at least the average rate for her position, was required to do more work than other higher level directors in her department, and supervised more employees than others in the department could constitute an adverse employment action. Ms. Wright's report supports Plaintiff's claim. Ms. Wright concluded that Brennaman was being paid too much for her position because she had lesser job responsibilities than others in the department. Specifically, Ms. Wright determined that (1) there may not have been equitable division of labor when comparing the job responsibilities of Brennaman with other managers in the department; (2) Brennaman's position was designated as "director" but it did not seem to have greater responsibility than the "manager" positions in the department; (3) Brennanman's position did not have any direct reports while other positions did; (4) Brennaman was paid at her average/median salary level while other positions were paid below their benchmark, including Plaintiff; and (5) the department as a whole could benefit from a clearer definition of job description, assignments, and pay grades. Mr. Rogers also concluded in his investigation that Plaintiff was discriminated against on the basis of her race in her level of pay and job responsibilities.

While these opinions are not determinative in the ultimate resolution of Plaintiff's claim, they are certainly sufficient evidence if they are admissible from which a jury could conclude that Plaintiff suffered discrimination.

Once again, however, Plaintiff's grievance of this situation was successful. On October 21, 2002, Plaintiff was informed that her salary was being adjusted as a result of Ms. Wright's review. Plaintiff's salary was increased from $50,000 to $54,740 per year. For the same reasons as discussed above, the court finds that Stavropolous applies here, and the court GRANTS Defendants' motion for summary judgment on Plaintiff's disparate treatment claim.[3]

3.   Denial of Promotion

Before the court begins to analyze Plaintiff's claims under the *McDonnell Douglas* framework, the court must point out several logical problems with the nature of Plaintiff's promotions claim. On the two occasions where candidates were actually interviewed, there is no dispute that both times, a panel of current employees interviewed the candidates and then made a recommendation as to which candidate would be selected. It is true that Carroll was one of the members of the panel, but Plaintiff has offered no evidence – other than her own speculation – that Carroll could somehow control the entire panel. Thus, the fact that Carroll, herself, may have favored a white candidate each time cannot be an adverse employment act

_____

[3]Although the Magistrate Judge applied the *Faragher/Ellerth* defense to Plaintiff's claims, the Eleventh Circuit has held that the defense applies only to hostile work environment claims. *See Hulsey v. Pride Restaurants*, 367 F.3d 1238, 1246 (11th Cir. 2004). Thus, the court will not address it further.

19

because Carroll's decision alone would have no effect on Plaintiff.  It was a decision of the panel as a whole as to who would be recommended for the position.  Carroll's was only one vote of several.  (The court addresses below one circumstance where Plaintiff asserts that she was not even selected for an interview.)  However, as demonstrated below, even if the court were to presume that Plaintiff could make out a prima facie case of discrimination or retaliation for failure to promote, Plaintiff has not proffered sufficient evidence from which a reasonable jury could conclude that she was better qualified than the candidate ultimately selected, although never placed in the job.

In her objections, Plaintiff appears directly to state for the first time that the "suspension of the selection process because of Plaintiff's EEOC charge is retaliation as well."  *See* Objections, at 23.  Regardless of whether this is the first time Plaintiff has clearly articulated this theory of retaliation, this argument also fails logically.  In the situations where the screening panel made a recommendation to promote a white individual, Ms. Nelson's recommendation to Johnston that the position not be filled until Plaintiff's grievance process was completed prevented the white candidate from receiving the position.  It did not prevent Plaintiff from receiving the position.  Had Johnston not followed Ms. Nelson's recommendation to allow the position to remain open, Plaintiff would never have had an opportunity to apply again because the position would have been filled by a white candidate.

20

The court now turns to Plaintiff's assertion that she was discriminated against on each occasion when she did not receive a promotion to Director, Classification and Employment. Plaintiff also claims that the position was ultimately withdrawn in retaliation for her complaints of discrimination.   It is undisputed that the position of Director, Classification and Employment, was never filled.   Therefore, Plaintiff proceeds under the version of a prima facie case in which an employer continues to seek applicants with the plaintiff's qualifications after the plaintiff is rejected for the position.   *See Cooper v. Southern Company*, 390 F.3d 695, 724 n.16 (11th Cir. 2004).   Once an employer offers a legitimate non-discriminatory reason for its actions, a plaintiff may show pretext by asserting superior qualifications, but a plaintiff will only be successful if the "disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *See Cooper*, 390 F.3d at 732. *See also Ash v. Tyson Foods, Inc.*, 126 S. Ct. 1195 (2006) (rejecting the "jump off the page and slap you in the face" language from the Eleventh Circuit as "unhelpful" and "imprecise" but approving language in *Cooper*).   The court addresses each instance of eligibility for promotion separately.

a)      August 2001 Posting

The position of Director, Classification and Employment, was posted in August 2001. Plaintiff was among the candidates selected to be interviewed.   The interview panel included: Carroll, Melissa Brennaman, Dawn Davis, Sonya Richburg (black), and Paula Gomes (black).

21

Ultimately, Plaintiff was informed on January 18, 2002, that Plaintiff was not selected to fill the position. The panel recommended that Nancy Strasner, a white female, be selected for the position, but the Affirmative Action Office at Georgia State recommended to Johnston that the position not be filled.

Mae Okwandu testified that part of her role in the Affirmative Action Office was to review all recommendations for hire. *See* Okwandu Depo., at 10-16. The purpose of this review was not entirely clear from her testimony. Ms. Okwandu testified that she would receive the resumes, applications, and interview evaluation sheets. *Id.* at 11. At times, she indicated that her review was intended to assure that the candidate selected met the minimum job qualifications and that the salary offered was appropriate. *Id.* at 11. She would also review the packet to see whether she believed that someone else was more qualified than the selected candidate. *Id.* at 12. If so, she would contact the hiring official and ask him to justify his selection. *Id.* When asked how she determined whether one individual was more qualified than another, Ms. Okwandu stated, "as a base I use the minimum hiring standards and compare that to what the applicant is bringing to the position." *Id.* at 15. "I also look at any preferred qualifications they may have. ***But my focus is mainly on the minimum hiring standards.***" *Id.* (emphasis added). Ms. Okwandu testified that she received the packet recommending that an individual be hired for the position of Director, Classification and Employment. *Id.* at 10. Ms. Okwandu, however, believed that "maybe [Plaintiff] should have been recommended to

22

hire." *Id*.  Ms. Okwandu believed that Plaintiff had better qualifications than the individual selected.  *Id.* at 10-11.  Ms. Okwandu, however, never articulated her reasons for why she believed Plaintiff to be better qualified than the individual selected.

Ms. Nelson testified that Carroll had told her she was looking for someone who had experience in both classification and employment to fill the position.  The candidate recommended for hire, Nancy Strasner, had experience on the employment/recruitment side, but had "somewhat limited experience" in classification and compensation.  *See* Nelson Depo., at 38.  Plaintiff, on the other hand,

> had more experience in classification and compensation with more limited experience in employment.  My take on it was that in that particular case they're somewhat equal.  The edge that Ms. Crawford would have had on that position was that she was an internal employee and also that she did have occasion – probably more than just occasion. On numerous occasions I know she worked with employment.   So she knew our internal workings.   And my recommendation was that – my finding was that Ms. Strasner was perhaps not the most qualified employee for this position.

*Id.*  Finally, Ms. Nelson was asked, "So it was your finding that Ms. Crawford was the most qualified employee for the position?"  And she responded, "Ms. Crawford was best suited for this position." *Id.* at 38-39.

The persuasive force of Ms. Nelson's "best suited" testimony is limited.   Clearly, Ms. Nelson was unwilling to testify that Ms. Crawford was the most qualified employee.  Further, Ms. Nelson, herself, testified that Ms. Crawford and Ms. Strasner were "somewhat equal," but she gave Plaintiff the edge because she "knew our internal workings."   The significance of this

factor in the selection process is unclear to the court.  In any event, giving full credit to the

testimony of Ms. Okwandu and Ms. Nelson, it still does not rise to the level required under

*Cooper* and *Tyson* to show pretext.  The court cannot emphasize this point strongly enough

because in her pleadings, Plaintiff repeatedly refers to the "fact" that she was determined to

be the best qualified for the position.  A close examination of Plaintiff's evidence, however,

demonstrates this is not the case.

b)   <u>January/February 2002 Posting</u>

The position was re-posted in January 2002, but no candidates were interviewed or

considered.  Plaintiff has provided no other information for this posting, and the court cannot

construe that the failure to interview any candidate for the position was an act of

discrimination against Plaintiff.

c)   <u>October 2002 Posting</u>

The position was posted again in October 2002.  Plaintiff was not selected by the initial

panel who screened applications to be on the slate of candidates interviewed.  It is not clear

at all in the record how the "screening panel" was selected or who they were.  In Plaintiff's

response to Defendants' statement of material facts, Plaintiff points to Carroll's deposition

as the source of information on the "screening panel."  Carroll testified that she believes she

sent out an "invitation" to individuals within a human resources advisory group to participate

in the screening.  *See* Carroll Depo., at 151.  Carroll also recalled that she would have given

24

the four individuals on the panel general information about the job and ask them to identify the most qualified candidates to select for an interview. *Id.* at 159-60.

In her deposition, Carroll was asked about Plaintiff's Exhibit 78 which is a contemporaneous memo from Carroll to Ms. Nelson apparently written in response to a complaint of discrimination by Plaintiff.  That memo sets forth greater detail on the process.  Carroll indicates that 110 individuals applied for the position.  Preliminary screening of the applicants was performed by the designated Recruiter in the Employment Office for minimum hiring requirements.  That reduced the pool to fifty-four.  Plaintiff was among the fifty-four.  Four reviewers then screened the pool of fifty-four candidates.  Two reviewers came from the Division of Finance and Administration, one from an academic division on campus, and one from a non-academic division.  From documentation attached to this memo, it appears that Roberta Bynum, Sandra Garber, Beth Jones, and Jeff Walker were the four panel members.  There is no information in the record as to the race of these individuals.  Each of the four was asked to list five to eight applicants they thought should be interviewed.

Each reviewer independently submitted his list to Carroll.  No candidates were selected by all four; three were suggested by three of the panel; six were suggested by two; and eight were suggested by one.  Carroll and Johnston narrowed the list to the three who had been suggested by three panelists.  Plaintiff was not among those three, but she had been among the six candidates who had been suggested by two panelists.  The top three candidates moved on to the interview process.  One of the top three dropped out before the interview because the

25

candidate received a different job offer.  Of the two remaining candidates, one was a black female and one was a white male.  The interview panel recommended that Russell Willis, a white male, receive the position.  Once again, Ms. Nelson recommended that the position not be filled while Plaintiff's grievances were being considered.

Based on this information, it is possible that Plaintiff could argue Carroll played a role in her not getting an interview because Carroll knew who the top three and top six candidates were and therefore knew that establishing the cut-off at the top three would eliminate Plaintiff from the interview stage.  However, Plaintiff has provided no evidence at all that she was more qualified for the position than the three individuals selected for interviews.  Therefore, she cannot establish that Carroll discriminated against her on the basis of her race by selecting candidates who were substantially less qualified than she was.  Further, the court notes that at least one of the three individuals selected for the interview was also a black female, which certainly cuts against Plaintiff's allegations of discrimination on the basis of race.

d)      Elimination of Position

Ultimately, Georgia State decided to eliminate the position of Director, Classification and Employment, altogether.  Again, assuming a *prima facie* case, Defendants argue that they eliminated the position based on the recommendations of Ms. Wright, a legitimate non-discriminatory reason.  Ms. Johnston testified that she decided to eliminate the position because "after reading [Ms. Wright's] report, I didn't think it would hurt the organization.  And frankly, we were under great resource pressure.  We were having budget reductions.  And we

26

had to find a way to return a lot of money to the University. 'Return a lot of money' is a budget term." *See* Johnston Depo., at 164-65.

Ms. Nelson testified that she had concerns "about the structure of the position and how it was not something that you find in a lot of organizations." *See* Nelson Depo., at 42. She continued, "you don't want to have the people who are deciding title and money and all of those types of things too closely tied with the people who are deciding who's going to get that position." *Id.* at 42-43. "And from a Human Resources perspective, normally the two are not together. They're two separate functions within an organization. My concern was having a director over both might have compromised, you know, effective running." *Id.* at 43.

Plaintiff has proffered no evidence to show that these determinations were pretext for a desire to deny her the position. Tellingly, in her response to Defendants' Statement of Material Facts on this issue, Plaintiff never contests that the position was eliminated due to the recommendations of Ms. Wright. *See* Plaintiff's Response, ¶ 29. Rather, she asserts that Carroll twice recommended a white person for the position and allowed Brennaman to use the title of Director, Employment. *Id.* These assertions are irrelevant to the issue of why the position was eliminated. For these reasons, the court finds that Plaintiff has failed to show that Defendants' legitimate non-discriminatory reasons for offering the job to different candidates and eventually eliminating the position were pretext for discrimination and GRANTS Defendants' motion for summary judgment as to Plaintiff's promotions claims.

27

Because the court has determined that Plaintiff did not suffer any constitutional violations, the court need not consider whether the individual defendants are entitled to qualified immunity under section 1983.

**III.     Conclusion**

The court ADOPTS AS MODIFIED the Report and Recommendation of the Magistrate Judge. The court GRANTS Defendants' motion for summary judgment [43-1].

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.


**IT IS SO ORDERED** this 8th day of March 2007.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

28